IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KWAI FUN WONG and WU WEI TIEN TAO
ASSOCIATION,

                   Plaintiffs,

     v.

DAVID V. BEEBE, a former Immigration and
Naturalization Service (nka Department of
Homeland Security) Official, and the UNITED
STATES OF AMERICA,

                   Defendants.

CV-01-718-ST

FINDINGS AND
RECOMMENDATIONS

STEWART, Magistrate Judge:

## **INTRODUCTION**

Following a July 24, 2002 appeal to the Ninth Circuit (*Wong v. United States*

*Immigration & Naturalization Serv., et al*, 373 F3d 952 (9th Cir 2004)), and further proceedings

in this court on remand, plaintiffs filed a Fourth Amended Complaint (docket #170), followed by

a Fifth Amended Complaint (docket #350).

1 - FINDINGS AND RECOMMENDATIONS

Plaintiff Kwai Fun Wong ("Wong") alleges that she is the Matriarch of the Tao Heritage, and the spiritual leader of plaintiff Wu Wei Tien Tao Association ("Association"), a worldwide non-profit religious organization registered in Oregon.[1]  Wong, who was born in Hong Kong, is a Tien Tao minister[2] and first entered the United States on July 14, 1992.  Seven years later, Wong was subjected to an expedited removal from the United States.  The surrounding circumstances of that removal form the basis for plaintiffs' claims in this case.

Wong alleges that her constitutional rights and her rights under the Religious Freedom Restoration Act, 42 USC § 2000bb-1 ("RFRA"), were violated by her arrest and removal from the United States in June 1999 by the Immigration and Naturalization Service ("INS")[3] and David V. Beebe ("Beebe"),[4] the former District Director of the INS office in Portland, Oregon. She also alleges that the United States improperly denied her the right to request reopening or reconsideration of the denial of her request for adjustment of status and subjected her to various torts which are cognizable against the United States under the Federal Tort Claims Act ("FTCA"), 28 USC §§ 1346(b), 2671-80.

---

[1]  Plaintiffs allege that the Association was formerly known as "Tien Tao Association, Inc." and is made up of four legal entities, namely Wu Wei Tien Tao Association Oregon; Tien Tao Association, Houston; Wu Wei Tien Tao Association, Texas; and Wu Wei Tien Tao Association, New York.  Fifth Amended Complaint, ¶ 4; Plaintiffs' Corrected Memorandum in Opposition to United States' Motion for Summary Judgment (docket #421), p. 17.  Defendants argue that the Association *of Oregon* is the only entity seeking damages in this case and that plaintiffs have no claim to damages based on loss of affiliation by legally and financially independent organizations in New York and Texas.  As discussed below, the claims of the Association (both local and "worldwide") are barred so this court need not determine the extent of damages which might flow from those claims.

[2]  There is a dispute over the date Wong became a minister.  Plaintiffs' Concise Statement of Material Facts (docket #417), ¶ 6; App 4, 18-19.  However, for purposes of these motions, this court accepts as true Wong's assertions about the length of her ministry, the sincerity of her religious beliefs, and the requirements and proscriptions of her faith.

[3]  All functions of the INS have now been transferred to the Department of Homeland Security ("DHS").  However, because this agency was known as the INS at all times relevant to plaintiffs' allegations, this court will refer to it as the INS, as did the Ninth Circuit.  *Wong*, 373 F3d at 958 n4.

[4]  Beebe served as the District Director in the Portland INS Office for approximately 12 years, until his retirement in October 2000.  App 106-07.

2 - FINDINGS AND RECOMMENDATIONS

Presently, Wong alleges three claims against Beebe for: (1) violation of the Fourth Amendment premised upon the strip searches she endured during her five-day detention (Fifth Amended Complaint, ¶¶ 36-38) ("First Claim"); (2) denial of her right to practice her religion in violation of the First Amendment (*id* at ¶¶ 39-41) ("Second Claim"); and (3) violation of RFRA based on her assertion that the exercise of her religion was substantially burdened by the denial of her adjustment of status application and the conditions under which she was detained (*id* at ¶¶ 46-48) ("Fourth Claim"). Wong and the Association also allege two claims against the United States for: (1) declaratory relief that they are entitled to pursue their post-denial rights to request reopening or reconsideration of the denial of Wong's April 20, 1999 application for adjustment of status[5] (*id* at ¶¶ 42-45) ("Third Claim"); and (2) violation of the FTCA based on the torts of false imprisonment, invasion of privacy, and negligence (*id* at ¶¶ 49-51) ("Fifth Claim").

Wong has now filed a Motion for Partial Summary Judgment (docket #400) only on her First Claim against Beebe for violation of the Fourth Amendment by causing her to be strip searched twice and her Fifth Claim against the United States under the Federal Tort Claims Act premised upon claims for invasion of privacy, negligence, and false imprisonment. In response, defendants have filed cross-motions for summary judgment, namely Beebe's Motion for Summary Judgment (docket #403) and the United States' Motion for Summary Judgment (docket #405) against each of plaintiffs' claims.

For the reasons that follow, this court recommends that Wong's motion be denied and that Beebe's motion and the United States' motion be granted in part and denied in part, leaving

---

[5] As discussed in more detail below, Wong filed a total of three applications for adjustment of status. However, plaintiffs do not seek to reopen or reconsider the first two applications for adjustment of status which were filed December 2, 1992 (Plaintiffs' Ex 3 and App 12-14) and December 8, 1994 (Plaintiffs' Ex 3 and App 33-36).

for trial only Wong's claims against Beebe for violation of the Fourth Amendment (First Claim) and against the United States for negligence with respect to her conditions of confinement (Fifth Claim).

## DISCUSSION

### I. Background Facts and Pertinent Allegations

#### A. Wong's Ministry and Entry into the United States

Wong became a Minister of Tien Tao in the mid-1980s. At that time, the last Patriarch of Tien Tao, Wu Wei Lao Zhu (Elder Cheung Fat Fan, respectfully called Qian Ren), was bringing many people to the United States to spread the Tien Tao to the West. Wong first entered the United States on July 14, 1992, under a B-2 visitor visa issued by the INS on March 11, 1992. Shortly after Wong's entry into the United States, the Tien Tao Association, Inc., filed a petition for an immigrant visa on behalf of Wong, asking that she be granted special immigrant status as a religious worker. Appendix in Support of Defendants' Motions for Summary Judgment ("App") attached to Declaration of R. Joseph Sher, 1-10 (Form I-360, Petition for Amerasian, Widower, or Special Immigrant, and supporting documentation). That petition was approved on November 9, 1992. App 11.

On December 2, 1992, Wong filed her first Form I-485 (Application for Permanent Residence), seeking permanent resident status. App 12-14. She filed a second Form I-485, (Application to Register Permanent Residence or Adjust Status) on December 8, 1994.[6] App 33-

---

[6] In early January 1993, Wong applied for and received an advance parole document authorizing her to reenter the United States any time before March 4, 1993. App 16. Wong apparently left the United States in early 1993, but did not reenter the United States until two weeks after the advance parole authorization expired. On March 19, 1993, Wong entered the United States using her B-2 visitor visa, gaining entry through September 18, 1993. App 21, 69. Wong again left the country and reentered on September 9, 1993. App 28, 69. Some time later, Wong again departed the United States and sought to reenter on November 14, 1994, by again presenting her B-2 visitor visa. App 32. However, she was referred for secondary inspection

(continued...)

4 - FINDINGS AND RECOMMENDATIONS

36.  Some time thereafter, pursuant to the instructions of Qian Ren, Wong relocated to Oregon

and became involved in the Association in Oregon.

As part of her adherence to Tien Tao, Wong took instructions and received guidance

from Qian Ren.  Qian Ren formed and started the Tien Tao Association, which was registered in

the State of Oregon and whose name was later changed to Wu Wei Tien Tao Association.

## B. **1999 Departure From and Return to the United States**

Qian Ren died in Houston, Texas, on March 16, 1999.  On March 25, 1999, without first

obtaining advance parole, Wong departed the United States in order to arrange and attend his

funeral.  When she returned to the United States (through the San Francisco port of entry) on

April 13, 1999 (App 43), Wong was ordered to report to the Portland INS office for a deferred

inspection on April 28, 1999.  App 43, 50-51.  Shortly thereafter, Wong contacted her attorney in

Portland.  App 264.

On April 15, 1999, Wong filed an Application for Advance Parole (Form I-131).

App 70.[7]  Then, on April 20, 1999, a week before the scheduled date of her deferred inspection at

the Portland INS office, Wong's attorney sent a Form I-485 (Application to Register Permanent

Residence or Adjust Status) to the INS's Nebraska Service Center.  App 44-47, 51.  A week

later, her attorney notified the Portland INS office, by means of a letter dated April 26, 1999,

addressed to the INS's Portland Port Director, Jack O'Brien ("O'Brien"), that Wong had

abandoned her prior adjustment of status application, had filed a new adjustment of status

---

[6](...continued)
when the immigration officer noticed that she had an I-485 petition pending.  *Id.*  Her departure without advance parole
necessitated the refiling of Wong's I-485 petition, which she filed during the time of her parole in to the United States between
November 14 and December 28, 1994.  App 31 & 226; 8 CFR 245.2(a)(4)(ii)(B).

[7]  Although the form was supposedly filed April 15, 1999 (App 48 & 70), it was not signed by Wong until April 19,
1999, and by Wong's attorney until April 22, 1999 (App 49).

5 - FINDINGS AND RECOMMENDATIONS

application and would not be appearing for the deferred inspection on April 28, 1999,

explaining:

> Under current immigration law, [Wong] is immediately allowed to refile her adjustment application under Section 245(i) of the [INA] based on an approved petition with a priority date of October 30, 1992. Attached is a copy of the INS cover letter and Federal Express confirmation of the alien's adjustment application refiled in the Nebraska Service Center on April 20, 1999.
>
> In order to avoid possible detention and removal from the United States at the time of her deferred inspection, I have asked [Wong] not to appear for the deferred inspection at this time. Should you require anything further or still wish to see [Wong], please let me know.

App 51.

Shortly before the time set for Wong's deferred inspection, one of her attorneys, Gretel

Ness ("Ness"), contacted Douglas Glover ("Glover"), a Supervisory Immigration Inspector in

the Portland INS Office, and asked him if he had seen the April 26, 1999 letter, explaining that

she believed Wong was eligible for adjustment of status under INA § 245(i), 8 USC § 1255(i).

App 188. Glover told Ness that he needed to research the issue. App 190 (Glover Depo, p. 25).

## C. INS Response to Post-Return Filings

Shortly thereafter,[8] Beebe convened a meeting to discuss the letter from Wong's attorney.

Beebe, Gerry Garcia ("Garcia") (the Assistant District Director for Examinations in the Portland

INS Office), Glover, O'Brien (Glover's supervisor), and Phillip Crawford ("Crawford") (the

Deputy District Director at the Portland INS Office) all attended the meeting. During the

---

[8] It is unclear from the record exactly when this meeting took place. However, Glover testified that the first time he became aware of Wong was during the telephone call from Ness (App 188), and Garcia testified that the meeting involved the letter which stated that Wong would not be appearing for her deferred inspection (App 181). Thus, this meeting apparently took place some time between the date when Ness contacted Glover (after the letter was sent on April 26, 1999) and the date scheduled for deferred inspection (April 28, 1999).

6 - FINDINGS AND RECOMMENDATIONS

discussion, Garcia stated that if Wong did not appear, she would be a fugitive from justice. App 181 (Garcia Depo, p. 12). In response to Beebe's question regarding a pending application for adjustment of status, Garcia said that if Wong had left the United States without advance parole, then the application for adjustment of status was abandoned. *Id*. He also told Beebe that he believed that a person who was paroled into the United States was not eligible to apply under INA § 245(i), 8 USC § 1255(i). App 182 (Garcia Depo, p. 13).

Beebe asked Garcia to request Wong's I-485 application from the Nebraska Service Center.[9] *Id*. Garcia then had to leave the meeting, and the meeting continued between Beebe, O'Brien, Glover, and Crawford. App 183 (Garcia Depo, p. 14). The "consensus was that an Expedited Removal Order should be entered into the file" and that "parole should be revoked at the time." App 149-50 (Crawford Depo, pp. 70-71).

Although he had authority to sign it himself, O'Brien later went to the office of the two Supervisory Immigration Inspectors (Glover and Greg Fiorentino) and requested that "someone . . . sign a . . . determination of inadmissibility" (Form I-860), notifying Wong that she was ineligible for admission to the United States because at the time of her application for admission (her return from Hong Kong on April 13, 1999), she was not in possession of a valid unexpired immigrant visa. App 54, 189-90 (Glover Depo, pp. 21-25). At that time, it "appear[ed to Glover] the decision had been made to place [Wong] into expedited removal proceedings, and since by that time [Glover] had some understanding of the case . . . [he] was asked to sign [the Notice and Order of Expedited Removal]." App 190 (Glover Depo, p. 25). The Order of Removal is dated May 20, 1999, and signed by both Glover and O'Brien. App 54.

---

[9] According to Beebe, adjustment of status applicants "typically had their adjustment applications forwarded, or they were instructed to forward their adjustment applications to one of four service processing centers in the United States operated by the Immigration Service for consideration." App 118 (Beebe Depo, p. 71).

7 - FINDINGS AND RECOMMENDATIONS

### D. **Adjudication of Form I-485**

Wong's adjustment of status application was referred to Pamela Cooley ("Cooley"), an adjudications officer in the Portland INS Office. Plaintiffs' Ex 46 (Cooley Depo), p. 11; Plaintiffs' Ex 47 (Garcia Depo), p. 15. Although adjustment of status applicants are generally brought in for a personal interview (Plaintiffs' Ex 47 (Garcia Depo), p. 31), Cooley did not interview Wong or contact her attorneys. Plaintiffs' Ex 46 (Cooley Depo), p. 54. Cooley recalls Garcia telling her that she needed to adjudicate Wong's adjustment of status application fairly quickly and that there was "pressure" to get Wong's adjustment of status request adjudicated quickly, but she does not recall any conversations as to the reasons for the rush. *Id* at 43-44.

Normally Cooley's practice is to review the entire contents of the applicant's A-file prior to making a decision on an adjustment of status application. *Id* at 74-75. Cooley, Elizabeth Godfrey ("Godfrey"), a Deportation Officer, and Garcia discussed Wong's eligibility to adjust status with three pending adjustment of status applications. App 142 (Cooley Depo, pp. 51-52). They "all concluded together that [Wong] did not merit adjustment of status" because she had "circumvented the normal immigrant visa processing processes." App 142, 145-46 (Cooley Depo, pp. 52, 73-74). Cooley reviewed Wong's application for adjustment of status, prepared a written decision, and forwarded the decision to Garcia for review. App 142 (Cooley Depo, p. 51). Garcia reviewed and approved the letter denying the applications and signed it for Beebe, as was standard practice. App 68-70, 184-85 (Garcia Depo, pp. 25-26). Garcia did not discuss the denial of Wong's applications with Beebe before he signed it. App 184 (Garcia Depo, p. 25). Although an I-485 adjudication normally takes from 12 to 24 months, Wong's was adjudicated in less than two months. Plaintiffs' Ex 47 (Garcia Depo), p. 37. Of the 12 or so religious worker

adjustment of status applications that were adjudicated in the INS's Portland office, Wong's was the first one ever denied.  Plaintiffs' Ex 47 (Garcia Depo), pp. 20-21; Plaintiffs' Ex 46 (Cooley Depo), p. 38.

### E.  Employment Authorization Letter and Wong's Arrest

Although unknown to Wong at the time, all of her pending I-485 applications were denied on June 3, 1999.  Plaintiffs' Ex 10.  On or about June 10, 1999, Beebe sent Wong an Employment Authorization Letter.  Plaintiffs' Ex 11.  In part, the letter claimed to have been written to Wong:

> to acknowledge receipt of [her I-485] application [and to notify her that] [p]ending final approval of [her] application, please be aware of the following: 1. The current processing time for this type of application(s) is fifteen (15) months. . .  3. If you applied for an Employment Authorization Document [which she did] you are scheduled to appear at ths office on Thurs 6-17-99 at 1:30 pm to receive your document in Room #117.

*Id*.

The issuance of the Employment Authorization Letter to Wong after denial of her I-485 applications directly contravened the INS policy prohibiting the use of such subterfuges for the purpose of luring unsuspecting individuals into an INS office in order to arrest, deport, and remove them from the country.  Plaintiffs' Ex 19 (Crawford Depo), pp 47-49.

In compliance with the Employment Authorization Letter, Wong appeared at the scheduled time in the INS's Portland office on Thursday, June 17, 1999, with Ness, her attorney, and Lily Li ("Li"), her interpreter.  App 267 (Ness Depo, pp. 38-39).  However, instead of having her employment authorization document processed, she was interviewed by immigration inspector Ron Spaude about her April 13, 1999 return from Hong Kong.  App 65-67.  Spaude

never spoke to Beebe about Wong, and Beebe apparently was not in the office at that time.

App 252 (Li Depo, pp. 223-24), 267 (Ness Depo, p. 40), 272 (Spaude Depo, p. 35).

Wong was then provided with a copy of a letter dated that same day (June 17) and signed

by Garcia denying her three applications for adjustment of status.  App 68-70, 184 (Garcia Depo,

p. 25).  That letter provided in part that "the decisions in this case are not subject to review given

your final order of removal pursuant to Section 235(b)(1) of the Act, as amended."  App 70.

Wong was then detained.  Godfrey escorted Wong to the detention area.  App 176.

Because the INS had no detention facilities in Portland, it detained people in county jails.

App 167 (Edenfield Depo, p. 9).  After being handcuffed, Wong was transported by INS officer

Richard Horne ("Horne") to the Multnomah County Detention Center ("MCDC") where she was

booked.  Plaintiffs' Exs 15-17; Plaintiffs' Ex 1 (Wong Depo), pp. 98-121, 127-137, 153-156.

### F.  Requests for Vegetarian Meals

As Wong was being escorted to the INS detention area, Li told Godfrey that Wong had

taken vows as a "lifetime vegetarian" and could not eat meat or any of five "impure vegetables,"

including garlic, onion, leek, tobacco, and alcohol.  App 177 (Godfrey Depo, pp. 31-32), 247

(Li Depo, pp. 170-72); Plaintiffs' Ex 1 (Wong Depo), p. 105.  Horne was told by someone at the

Portland INS office that Wong needed vegetarian food, so he wrote "please vegetarian food only,

thank you" on the booking form at MCDC.  App 71 (booking sheet); App 216-17 (Horne Depo,

pp. 32-33).  Although Godfrey understood that Wong's vegetarian diet was related to her

religion (App 177 (Godfrey Depo, p. 32)), she either did not communicate that part of the

information to Horne, or if she did, Horne neglected to specify it in the booking form.  App 71.

The term "vegetarian," as apparently used by Tien Tao adherents, means a strict vegetarian (or vegan) diet excluding all animal products, including dairy products and eggs. Plaintiffs' Ex 38.  Someone at MCDC brought Wong milk and "what appeared to be an egg and ham sandwich" which she could not eat.  Plaintiffs' Ex 1 (Wong Depo), p. 109.  After being transferred to another jail (Inverness), Wong was only given "meat, eggs and milk," which she could not eat.  *Id* at 113.  On the second day of her detention, the woman who delivered meals at that facility, Susan Liu ("Liu"), spoke Cantonese and became concerned because Wong was eating so little.  *Id* at 114.  Wong told Liu she was a vegetarian and had no one there to interpret for her.  *Id*.  Liu helped Wong place a phone call to Li and to fill out the necessary paperwork so that Li could visit Wong in jail.  *Id* at 115.  On the third day of her detention, Li visited Wong in the jail.  *Id* at 118.  She told Wong she was going to contact Wong's attorney to arrange for Wong's release and arrange vegetarian meals for her.  *Id* at 129.

MCDC offered religious and medical diets.  App 391-92.  However, any request for special meals based on religious grounds had to be communicated through the chaplain. App 391-96 (Yankee Depo, pp. 9-20).  Li contacted both Godfrey and Paige Edenfield ("Edenfield"), the supervisory Detention and Deportation Officer,[10] several times after Wong was detained and told her that Wong was not receiving a vegetarian diet.  Plaintiffs' Ex 31 (Li Depo), pp. 180-84.  Although both Godfrey and Edenfield assured Li that they would contact Multnomah County about the issue, the record is devoid of evidence indicating that either Godfrey or Edenfield contacted Multnomah County and communicated that Wong needed a vegetarian diet based on religious grounds.

_____

[10]  Edenfield does not recall ever being contacted by Li or MCDC with regard to vegetarian meals.  Plaintiffs' Ex 28 (Edenfield Depo), pp. 14-15.

11 - FINDINGS AND RECOMMENDATIONS

Either because MCDC assumed the request on the booking form was medically based, or because Wong followed Liu's suggestion a day or two later to tell the jail's doctor that eggs, meat and milk made her "very uncomfortable" (Plaintiffs' Ex 1 (Wong Depo), pp. 119-21), at some unknown time during Wong's detention, MCDC slated her to receive a "VEGETARIAN / BLAND / MILK-FREE / NO EGGS" diet.  App 72.

**G.  <u>Strip Searches</u>**

During her detention with Multnomah County, Wong was subjected to two strip searches, first when being transferred from MCDC to Inverness Jail and again when being transferred back to MCDC.  Plaintiffs' Ex 1 (Wong Depo), pp. 111-12, 133; App 53.  She was required to remove all her clothing and bend over in front of male jail staff so that visual body cavity searches could be conducted.  *Id* at 111-12.  She found these searches embarrassing and upsetting.  *Id*.  These searches were undertaken pursuant to a provision in the Multnomah County Sheriff's Office Division Operational Procedure Manual (1995 Edition) which required strip searches "[b]efore a change of housing assignment from Reception or transfer to a different Multnomah County facility."  Plaintiffs' Ex 20 (Multnomah County Sheriff's Office Division Operational Procedure Manual (1995 Edition), CD07.109.053, subpart 4).

The INS policies prohibit strip searches of detainees by either the INS or its contractors in detention facilities absent "some rational relationship to institution safety or security" or "a reasonable suspicion that contraband or evidence may be concealed on the person."  Plaintiffs' Exs 22-25; Plaintiffs' Ex 26 (Beebe Depo), p. 68.  At no time did the INS have a reason to believe that Wong was in possession of drugs, weapons or contraband.  Plaintiffs' Ex 29 (Godfrey Depo), pp 32-33 (no reason to believe she was carrying weapons and no reason to frisk

(pat search) her); Plaintiffs' Ex 30 (Horne Depo), pp 8-9, 38-39 (no particular concern about safety when transporting Wong; no reason to believe Wong was carrying a weapon or was in possession of contraband).

INS officers regularly inspect facilities in which INS detainees will be held, including a review of the existing policies and procedures.  Plaintiffs' Ex 29 (Godfrey Depo) pp. 42-46. During the relevant time period, the inspection forms were given to Edenfield or the Assistant District Director for Detention, Deportation and Parole and then forwarded to headquarters.  *Id*. Edenfield knew that everyone booked into MCDC was strip searched.  App 170 (Edenfield Depo, pp. 15-16).

Beebe was unaware that MCDC routinely strip searched everyone placed in its custody, but would not have been "concerned" or "bothered . . . a bit" if MCDC routinely strip searched INS detainees.  App 116 (Beebe Depo), p. 65.  Instead, he deferred to the Multnomah County Sheriff regarding the operation and management of his detention facilities and did not believe it would have been prudent to approach the sheriff with a proposal not to routinely strip search the INS's detainees.  Plaintiffs' Ex 26 (Beebe Depo), pp. 66- 69.

### H.  Removal

On June 22, 1999, after spending five days in detention, Wong was transferred from MCDC custody to INS custody, transported to the airport, escorted from Portland to San Francisco, and removed from the United States on a flight to Hong Kong.  App 74, 325-26 (Wong Depo, pp. 154-55), 397-98 (Yankee Depo, pp. 21-22).

## II.  Claims Against Beebe

13 - FINDINGS AND RECOMMENDATIONS

Beebe seeks summary judgment against each of Wong's claims on the basis of qualified immunity.[11]  The First Claim (Fourth Amendment), the Second Claim (First Amendment), and the Fourth Claim (RFRA) are premised upon one or more of three events or series of events.  First, Wong alleges that the denial of her adjustment of status application violated both her First Amendment and RFRA rights (Second and Fourth Claims).[12]  Second, she alleges that she was denied meals adequate to sustain her in good health that satisfied the dietary laws of her religion in violation of both her First Amendment and RFRA rights (Second and Fourth Claims).  Finally, she alleges that the two strip searches she endured while detained by the INS violated her Fourth Amendment and RFRA rights (First and Fourth Claims).

### A.  <u>Qualified Immunity</u>

 The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 US 800, 818 (1982).  To determine whether Beebe is entitled to qualified immunity, this court must follow two analytical steps, as discussed in *Saucier v. Katz*, 533 US 194, 201 (2001); *see also Moreno v. Baca*, 431 F3d 633, 638 (9th Cir 2005).  The first step is to determine whether, viewing the record in the light most favorable to the party asserting the injury, the

---

[11] This court previously concluded that federal officials sued under RFRA are entitled to raise a qualified immunity defense.  Findings and Recommendation dated April 26, 2005, pp. 20-21 (docket #151), adopted by Order dated June 28, 2005 (docket #169).

[12] Defendants argue that Wong raises no RFRA claim premised upon the denial of her adjustment of status application based on a sentence in one of this court's prior opinions.  *See* Reply Memorandum in Support of David Beebe's Motion for Summary Judgment (docket #428), p. 14, n. 9.  However, Wong contends that she does raise such a claim and the sentence cited by defendants was simply this court's summary of what it could discern were the ways in which Wong alleged that her "right to practice her religion" were infringed.  The sentence relied on by defendants is *dicta* based on this court's struggle to accurately understand and analyze Wong's claims.  In order not to unduly prejudice Wong, this court will not rely its perhaps too-narrow interpretation of her Third Amended Complaint.

officer's conduct violated a constitutional right. *Saucier*, 533 US at 201. If so, the next inquiry is whether the right was clearly established at the time alleged. *Moreno*, 431 F3d at 638.

There is no *respondeat superior* liability in constitutional tort actions. *Terrell v. Brewer*, 935 F2d 1015, 1018 (9th Cir 1991). As a result, Beebe cannot be held liable simply due to his position as the District Director of the Portland INS Office. Instead, supervisory defendants must play an "affirmative part in the alleged deprivation of constitutional rights." *Graves v. City of Coeur D'Alene*, 339 F3d 828, 848 (9th Cir 2003). A supervisor is liable for the constitutional violations of subordinates "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F2d 1040, 1045 (9th Cir 1989). "[T]he critical question is whether it was reasonably foreseeable that the actions of the particular INS officials who are named as defendants would lead to the rights violations alleged to have occurred during Wong's detention." *Wong*, 373 F3d at 966, citing *Gini v. Los Vegas Metro. Police Dep't*, 40 F3d 1041, 1044 (9th Cir 1994). It is sufficient if the defendant set into motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury. *Hydrick v. Hunter*, 466 F3d 676, 689 (9th Cir 2006), citing *Johnson v. Duffy*, 588 F2d 740, 743-44 (9th Cir 1978).

### B. <u>Denial of Adjustment of Status Application</u>

Wong filed three applications for adjustment of status. Her claims against Beebe for violating the First Amendment (Second Claim) and RFRA (Fourth Claim) are based in part on her contention that the denial of her third (April 20, 1999) application for adjustment of status was the result of discrimination against her due to her religious practices, beliefs, or association. Fifth Amended Complaint, ¶ 32. After a careful review of the record in this case, this court

concludes that Bebee is entitled to summary judgment against these claims because they either allege claims (right of access to followers) previously dismissed by this court or because Beebe enjoys qualified immunity on the basis that the law was not clearly established.

### 1. Claims Previously Dismissed

In considering previous motions filed in this case, this court has struggled to correctly construe and analyze Wong's claims. In those endeavors, this court has construed Wong's allegations of interference with her religious rights under the First Amendment and RFRA as encompassing interference with a right of association (Wong's right to associate with her followers and vice versa) and interference with a right to practice her religion (due to the conditions under which she was detained). This court distinguished the allegations concerning Wong's conditions of confinement (strip searches and denial of vegetarian meals) from other allegations which did not burden the practice of Wong's religion, including allegations that she was denied a translator and access to information about her rights or how to contact her attorney. Findings and Recommendation (April 26, 2005) (docket #151) ("April 26, 2005 F&R"), adopted by Order dated June 28, 2005 (docket #169). This court dismissed all claims by both Wong and the Association insofar as they were premised upon plaintiffs' associational rights. *Id* at 21-23 (RFRA claim); Findings and Recommendation (November 17, 2005) (docket #238), p. 7, adopted by Order dated January 9, 2006 (docket #284) (First Amendment claim).

In an effort to distance the First Amendment and RFRA claims alleged in the Fifth Amended Complaint from those rulings, Wong contends that the discriminatory denial of her application for adjustment of status infringed her right to practice her religion by substantially interfering with her ability to carry out the instructions of her spiritual leader, Qian Ren, to

16 - FINDINGS AND RECOMMENDATIONS

maintain and supervise all activities at an altar in Oregon, as well as with her ability, as the chosen Matriarch and Qian Ren's successor, to lead the Tien Tao arena nationwide. Although Wong does not further explain this new recharacterization of the allegations, it is evident that the inability to associate with her followers is at least part of the causal link between the alleged harm (the allegedly discriminatory denial of the adjustment of status application) and the alleged injuries (inability to maintain and supervise all activities at the Oregon alter and to lead the Tien Tao arena nationwide). For the same reasons previously articulated by this court, any claim premised upon a denial of associational rights fails.

Although this court previously understood that a claim to a denial of associational right was the only allegation of these claims separate and apart from Wong's conditions of confinement claims, Wong now appears to assert that the denial of her adjustment of status application resulted in her removal from the United States (which interfered with her ability to act as the chosen Matriarch and to faithfully carry out Qian Ren's instruction to maintain an Oregon altar). However, Wong has failed to allege or establish any clearly established right to have her adjustment of status application approved in order for her to be in the United States to perform her religious functions. Moreover, Wong was removed because an Order of Removal was entered against her (on May 20, 1999), which took place prior to the ruling on her adjustment of status application (on June 3, 1999). The entry and execution of the Order of Removal may not be reviewed by this court, *see* 8 USC § 1252 (a) & (g), and the pending application for adjustment of status did not suspend or terminate removal proceedings, *see Rubio De Cachu v. INS*, 568 F2d 625, 628 (9th Cir 1977), leaving Wong to argue that Beebe should have exercised his discretion differently to adjust her status. However, the INA precludes such a

17 - FINDINGS AND RECOMMENDATIONS

claim.  *See* 8 USC § 1252(a)(2)(B) (stripping courts of jurisdiction to review denials of discretionary relief, including denials of adjustment of status applications).  For these reasons alone, Bebee is entitled to summary judgment against the First Amendment and RFRA claims to the extent they are premised upon an allegedly discriminatory denial of Wong's adjustment of status application.

### 2.  Qualified Immunity

Even if the above arguments proved no hurdle to Wong's First Amendment and RFRA claims based on a denial of her adjustment of status application, Bebee argues that he is entitled to qualified immunity due to a lack of a clearly established right.  This court agrees.

Wong's religious discrimination claims are premised upon the contention that Bebee denied her adjustment of status application due to animus against Wong's religious beliefs or practices.  Thus, the issue is whether Wong had a constitutional right to have her adjustment of status application adjudicated without the taint of religiously-based discriminatory animus, and if so, whether that right was clearly established at the time Bebee denied Wong's adjustment of status application.[13]

Wong argues forcefully that Bebee was responsible for the denial of her adjustment of status application, duped her into coming in to pick up her employment papers so that he could then have her arrested, and started into motion the events that led to her unconstitutional strip/orifice searches and summary removal from the United States.  Even construing these contentions in Wong's favor, Wong has failed to present any authority that she had a First

---

[13]  This court previously addressed but rejected the argument that Wong's immigration status affected her claims of unlawful conditions of confinement.  April 26, 2005 F&R, pp. 21-23.

18 - FINDINGS AND RECOMMENDATIONS

Amendment or RFRA right to an adjudication of her adjustment of status application free of discriminatory animus.

The Ninth Circuit previously held "Wong's allegations of invidious discrimination [were] sufficient . . . to make out a Fifth Amendment discrimination claim arising out of the INS officials' actions with respect to [the] post-return rejection of her adjustment of status applications" *Wong*, 373 F3d at 975.  Nevertheless, due to "the uncertainty surrounding the constitutional status of an alien in Wong's unusual position during the period after her return," the Ninth Circuit granted qualified immunity to INS officials on Wong's equal protection claims finding that Wong had not alleged violations of clearly established law.  *Id* at 976.  The court reached this conclusion based upon the dearth of case law by either the Supreme Court or the Ninth Circuit recognizing a right to be free from discrimination in such immigration proceedings:

> Although we [previously] suggested . . . that aliens in Wong's position *might* have some constitutional rights, we have never squarely held that such aliens are entitled to equal protection guarantees, nor has the Supreme Court. . . .   Under these circumstances of constitutional uncertainty regarding race discrimination against nonadmitted aliens, the contours of any constitutional doctrine we now recognize were not sufficiently clear that a reasonable INS officer would have realized that Wong after her return was entitled to Fifth Amendment equal protection with regard to immigration-related decisions.

*Id* (emphasis in original, citations omitted).

Key to the Ninth Circuit's decision was Wong's immigration status under the "entry fiction," under which she was deemed to have not yet "entered" the country for immigration purposes, even though she was physically present inside the borders of the United States.  *Wong*,

19 - FINDINGS AND RECOMMENDATIONS

373 F3d at 976 n31 (emphasizing that it was "quite likely" that qualified immunity would not protect defendants if decisions made before her departure were under consideration). The Ninth Circuit later noted that in *Wong* it "[c]onfronted for the first time . . . the question whether the entry fiction deprives non-admitted aliens of all substantive constitutional rights" and lamented that, even after *Wong*, the "precise reach of the entry fiction doctrine is unclear." *Alvarez-Garcia v. Ashcroft*, 378 F3d 1094, 1098 (9th Cir 2004).

Thus, for the same reasons articulated by the Ninth Circuit with regard to Wong's Fifth Amendment claims, Wong has failed to establish that she had a clearly established statutory or constitutional right for an adjudication free of discriminatory animus at the time of that denial. Bebee therefore is entitled to qualified immunity from the First Amendment claim. This same line of reasoning forecloses any RFRA claim premised upon the denial of Wong's third adjustment of status application.

As a result, Beebe is entitled to summary judgment on the Second Claim (First Amendment) and Fourth Claim (RFRA) to the extent those claims are premised upon a constitutional violation due to the denial of Wong's application for adjustment of status.

### C. __Meals Provided in Detention__

Beebe also is entitled to summary judgment against Wong's Second and Fourth Claims to the extent they are premised upon the denial of a vegetarian diet while detained. There is simply no evidence linking Beebe with the failure to provide meals which would adequately meet Wong's religious needs.

The record reveals that Multnomah County had in place a policy of accommodating medically or religiously based dietary requests. Religiously-based dietary requests had to be

made through the jail's chaplain.  A request for "vegetarian food only" might generate a medical inquiry as to the basis of the request, but not a religious inquiry.  Unlike the situation with the strip searches (discussed below), that policy does not give rise to any inference that Beebe either knew or should have known that Wong's religiously-based dietary needs would not be met in Multnomah County jails.  Moreover, nothing in the record indicates that Beebe was aware of the inadequacy of the meals Wong was receiving, of Li's calls to Godfrey and Edenfield, or of Wong's communications to MCDC staff regarding the religious insufficiency of the meals at MCDC.

Absent evidence making this linkage between Beebe and the jail's conduct, Beebe is entitled to summary judgment against the Second Claim (First Amendment) and Fourth Claim (RFRA) insofar as they are based on the assertion that Beebe violated Wong's First Amendment rights by denying her meals sufficient to meet the requirements of her religion.

### D.  Strip Searches

#### 1.  Fourth Amendment (First Claim)

Both Wong and Beebe seek summary judgment on her First Claim against Beebe for subjecting her to strip searches in violation of the Fourth Amendment.  Beebe does not contest that the type of blanket strip searches to which Wong was twice subjected violate the Fourth Amendment.[14]  Instead, he argues that he is entitled to qualified immunity for two reasons: (1) he did not cause the violation of Wong's Fourth Amendment rights; and (2) even if he did, Wong's right not to be subjected to an unreasonable search of her body was not clearly established in June 1999.

---

[14]  The first strip search occurred when Wong entered MCDC and the second strip search occurred later when she was transferred between Multnomah County jails.

### a. __Constitutional Violation__

Wong argues that even if Beebe did not conduct the strip searches himself, he is liable because he set in motion the series of events that led to the violation of her Fourth Amendment rights.

It is unclear what role Beebe played in deciding that Wong was inadmissable or removable.  Beebe did not sign the Notice and Order of Expedited Removal and denies ever making or consulting on any decisions regarding Wong and claims that he was not aware of the Wong case prior to her removal.  App 110, 113, 134-35 (Beebe Depo, pp. 47, 53, 117-18).  Yet other witnesses confirm that he convened and attended a meeting to discuss Wong's adjustment of status application which she had filed with the INS's Nebraska Service Center.  Beebe asked to have her file transferred to Oregon and the meeting resulted in the decision to revoke Wong's parole.  After that meeting, Garcia told Cooley that Wong's application had to be adjudicated quickly because there was pressure from somewhere to do so.  Although an adjudication of an I-485 normally takes from 12 to 24 months, Wong's I-485 was adjudicated in less than two months.  During that process, Wong's attorneys were never contacted for information.  Of the 12 or so religious worker adjustment of status applications that were adjudicated in the Portland District Office, Wong's was the only one ever denied.  For purposes of this motion, this court must view the facts most favorably to Wong.  From that perspective, it is reasonable to infer that Beebe played an affirmative role in causing Wong's revocation of parole, denial of adjustment of status, and removal.

The decision regarding where to detain Wong was made by the on-duty detention supervisor at the time of Wong's transfer to detention, not by Beebe.  However, the record raises

22 - FINDINGS AND RECOMMENDATIONS

an issue of fact as to whether Beebe knew or should have known that if Wong was removed, she would be transferred to a Multnomah County jail and subjected to a strip search.  As Beebe acknowledges, he was ultimately responsible for the conditions in the detention facilities. App 115 (Beebe Depo, p. 64).  Under 8 USC § 1231(g)(1), the district director of the INS is mandated to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."   As the District Director, Beebe signed the contract with the Multnomah County Sheriff for housing INS detainees in 1994 (App 421-30), and Edenfield signed the contract extension in 1999.  Although the record is not clear, it appears that the only other detention facilities used by the INS Portland office at that time were the Yamhill County and Clark County jails.  Plaintiffs' Ex 28 (Edenfield Depo), p. 16; Plaintiffs' Ex 41.  Although Beebe had the authority to use detention facilities other than local jails, such as hotels and motels, he choose not to do so, apparently for financial reasons.  *Id*; Plaintiffs' Ex 26, pp. 66-67; Plaintiffs' Exs 40 & 41 (January 1999 refusal by Port of Portland and Delta Airlines to take custody and arrange housing for detained aliens due to cost of providing security).  Therefore, Beebe knew that Wong would be detained at a local jail, including MCDC, pending her removal.

According to the contract, the Multnomah County Sheriff was required to follow federal law.  Yet as early as 1995, the Multnomah County jails followed a policy of routinely conducting strip searches on prisoners being transferred in and out of custody, contrary to the INS policy for strip searches.  However, Beebe states that he did not review the Multnomah County policy, claims that he was unaware of it, and apparently delegated responsibility to his employees for monitoring the conditions of confinement for those in INS custody.  App 115-16 (Beebe Depo, pp. 64-65).  Even if Beebe was not actually aware of Multnomah County's blanket strip search

23 - FINDINGS AND RECOMMENDATIONS

policy, as he claims, it could reasonably be inferred that he should have known of it.  After all, he is charged with knowledge of the INS policy prohibiting routine strip searches on detainees by contrractors, and Edenfield, his supervisory detention and deportation officer, freely admitted knowledge of MCDC's blanket strip search policy.  Plaintiffs' Ex 28 (Ededfield Depo), pp. 15-16.  Even more troubling, Beebe admitted that a blanket strip search policy would not have "concerned" or "bothered [him] a bit" even though it violated the INS policy.  App 116 (Beebe Depo), p. 65.

If foreseeability alone suffices, then Beebe could be held liable for the constitutional harm inflicted on Wong even though he was not directly involved in the decision where to detain Wong.  Had he not entered into a contract with the Multnomah County Sheriff or had he not turned a blind eye to – or had he even been the least bit concerned about – Multnomah County's blanket strip search policy, then Wong would not have been subjected to strip searches while detained in the Multnomah County jails.

Another court found a causal connection in a similar situation.  In *Tungwarara v. United States*, 400 F Supp 2d 1213 (ND Cal 2005), the plaintiff alien was detained by an immigration inspector after she tried to gain admission to the United States.  She was then transported to a local detention facility, where she was strip searched pursuant to jail policy.  She alleged that the immigration inspector was liable under the Fourth Amendment for causing her detention and unlawful strip search.  The inspector was not involved in the decision to detain the alien or where to detain her.  However, the inspector had coerced her into withdrawing her application for admission and making misrepresentations regarding her intent which resulted in a finding that she was a flight risk and should be detained pending removal.  The court found that this

coercion, combined with undisputed knowledge of the local jail's strip search policy, raised a triable issue of material fact as to whether the inspector's conduct was causally linked to the asserted injury.          Unlike the inspector in *Tungwarara*, Beebe had no direct contact with Wong and did not coerce her into making any misrepresentations regarding her intentions. However, the evidence supports the inference that, despite his denial, Beebe participated in the decision to issue the Expedited Removal Order and deny adjustment of status.  If he did, then he knew that Wong would be detained as a result, knew that she would likely be transferred to a Multnomah County jail, and should have known of Multnomah County's blanket strip search policy which he condoned.  From the standpoint of foreseeability, this appears to be a sufficient causal link to at least raise a triable issue of fact for purposes of summary judgment.

## b. Clearly Established Law

Citing *Tungwarara*, Beebe also argues that he is entitled to qualified immunity because Wong had no clearly established right not to be strip searched.  After finding that some level of suspicion is required under the Fourth Amendment to conduct strip searches of non-admitted aliens, the court in *Tungwarara* determined at the second step of the qualified immunity analysis that such a right was not clearly established in January 2002.  *Id* at 1222-23.  The court recognized that prior Ninth Circuit cases had recognized the "unsettled" nature of the case law regarding the constitutional rights of non-admitted aliens.  *Id* at 1220-21, citing *Wong*, 373 F3d at 976; *Barrera-Echavarria v. Rison*, 44 F3d 1441, 1449 (9th Cir) (*en banc*), *cert denied*, 516 US 976 (1995).  The court also recognized that previous cases had dismissed claims of improper search and seizure on the ground that such aliens are not afforded due process protections, *see Papa v. United States*, 281 F3d 1004, 1010 (9th Cir 2002), and implied that the text of the Fourth

Amendment does not apply to arriving aliens, *see United States v. Verdugo-Urquidez*, 494 US

259, 265 (1990). *Tungwarara*, 400 F Supp 2d at 1221. After distinguishing several cases as not

addressing the particular situation of a strip search of a nonadmitted, adult alien at the border, the

court then concluded that although:

> a non-invasive strip search of a non-admitted adult alien at the border
> without *any* suspicion of any kind is unconstitutional, the Court cannot
> conclude that this right was clearly established at the time of the incident.
> If the same search had occurred later after the Ninth Circuit's decision in
> *Wong,* or had been more invasive or abusive at the time, the Plaintiff's
> "clearly established" rights would likely have been violated. On the
> uncontested facts of the search here, however, [the inspector] is entitled to
> qualified immunity.

*Id* at 1222 (emphasis in original).

Due to inconsistencies in her sworn statement to immigration officials at the port of

entry, the plaintiff in *Tungwarara* was deemed a flight risk and not eligible for parole into the

country. Wong, on the other hand, was not deemed to be any kind of risk and was readily

paroled into the country pending a deferred inspection. Although she did not appear for the

deferred inspection, her attorney gave advance notice with an explanation. There is no

suggestion in the record that Wong would flee. Second, the search in *Tungwarara* was described

as no more than a "pat down" conducted in private by a female. Wong's search, in contrast, was

far more extensive, requiring her to strip naked, bend over for visual inspection of her genital

and anal area, in an area that was separated from the public only by a thin curtain, through which

Wong could see male staff (and presumably they could see her too), who handed her clothes

after the search. These key distinctions render *Tungwarara* factually inapposite.

Furthermore, it is not necessary that the exact conduct be declared unconstitutional

before a finding may be made that a right was clearly established. *United States v. Lanier,* 520

26 - FINDINGS AND RECOMMENDATIONS

US 259, 271 (1997) (involving the Eighth Amendment); *see also*, *Anderson v. Creighton,* 483
US 635, 640 (1987).  As the Ninth Circuit has recently noted, "precedent directly on point is not
necessary to demonstrate a clearly established right."  *Hydrick*, 466 F3d at 690, quoting *Blueford
v. Prunty*, 108 F3d 251, 255 (9th Cir 1997).  Rather, "[i]f the only reasonable conclusion from
binding authority were that the disputed right existed, even if no case had specifically so
declared, [Defendants] would be on notice of the right and [officials] would not be qualifiedly
immune if they acted to offend it." *Id*.

It was clearly established well before June 1999 that generalized strip searches of persons
arrested for minor offenses without reasonable suspicion violate the Fourth Amendment.  *Giles
v. Ackerman*, 746 F2d 614 (9th Cir 1984), *cert denied*, 471 US 1053 (1985).  With respect to
incarcerated prisoners, the Fourth Amendment requires searches to be reasonably related to
legitimate penological interests.  *Michenfelder v. Sumner*, 860 F2d 328 (9th Cir 1988).  It also has
been clearly established for over 20 years that although routine border searches are allowed, the
Fourth Amendment protects aliens seeking admission at the border from unreasonable searches,
including strip searches and body-cavity searches.  *United States v. Montoya De Hernandez*, 473
US 531, 539 (1985).  In particular, it is unconstitutional for INS officers to strip search illegal
aliens at the border without a reasonable suspicion that the search will reveal weapons or
contraband.  *United States v.Gonzalez-Rincon,* 36 F3d 859 (9th Cir 1994), *cert denied*, 514 US
1008 (1995); *also see Flores v. Meese,* 681 F Supp 665, 669 (CD Cal 1988) (finding that INS
policy of routinely strip searching juveniles, absent a reasonable suspicion, violates the Fourth
Amendment).  Also in June 1999, the INS itself prohibited blanket strip searches of persons in
INS custody.

27 - FINDINGS AND RECOMMENDATIONS

In sum, no INS official could have reasonably believed in June 1999 that without violating the Fourth Amendment, someone who presented no cause for suspicion of harboring contraband, who had not been charged with any crime, and who did not pose any risk of flight or danger, could be detained in a jail facility that conducted blanket strip searches.

Accordingly, Beebe is not entitled to summary judgment against the First Claim for violation of the Fourth Amendment on the basis of qualified immunity.  However, due to issues of fact as to whether Beebe set in motion the series of events leading to the strip search of Wong, Wong also is not entitled to summary judgment on this claim.

### 2. RFRA (Fourth Claim)

Wong alleges that the strip searches violated her "lifetime purity vow of celibacy."  Fifth Amended Complaint, ¶ 27.  However, Wong testified only that she found the searches embarrassing, not that they somehow interfered with or substantially burdened her religious beliefs.  App 319-20.  This is consistent with the testimony of Dr. Shean Lin Want, a Tien Tao minister, that an involuntary strip search does not violate the Tien Tao vow of celibacy. App 365.

Nevertheless, Wong contends that a reasonable juror could find that Wong's vows of celibacy were substantially burdened by the dehumanizing strip searches to which she was subjected and by her treatment as a common criminal without any basis.  This court disagrees. In the absence of any evidence that a strip search somehow violated Wong's religious beliefs, Beebe should be granted to summary judgment against the Fourth Claim alleging a violation of RFRA with respect to the strip searches.

### III.  Claim Against the United States for Declaratory Relief (Third Claim)

28 - FINDINGS AND RECOMMENDATIONS

Wong[15] contends that she is entitled to declaratory relief that the United States (and its agencies INS or DHS) must allow her to file a motion to reopen the proceedings on her third (April 20, 1999) application for adjustment of status or have the prior decision on that application reconsidered.  Fifth Amended Complaint, ¶ 44; *see* 8 CFR § 103.5(a).  The United States seeks summary judgment against this claim, contending that it is moot and, even if not moot, it did not improperly deny Wong the opportunity to file such a motion.

///

///

///

A.  **Whether the Declaratory Relief Claim is Moot**

   1.  **Wong's Intent to Live in the United States**

The United States argues that this claim is now moot because Wong no longer intends to live in the United States.  That argument is based on Wong's deposition testimony that "[s]ince [defense counsel] kept on pressing me about where I intend to stay, I want to tell him it is Hong Kong."  App 303.  However, due to nuances in the language used by Wong, her testimony is more ambiguous than the written transcript reveals.  Immediately following Wong's statement, the interpreter clarified that Wong's testimony was not tense-specific:  "THE INTERPRETER: The interpreter wants to add in – specifically, this sentence, there is no adverb.  So the interpreter does not know the tense, whether this is current or past.  The interpreter doesn't know."  *Id.*  In

---

[15] The Association is also listed as a plaintiff with respect to the Third Claim for declaratory relief.  This court previously found that the Association had no standing with respect to the Third Claim.  Opinion & Order dated April 26, 2005 (docket #150), p. 7.  Moreover, as discussed below, the same regulation that precludes Wong's claim due to the abandonment of her application also operates to preclude the Association's claim.  Finally, the reasons which Wong cites for her inability to file her motion for reopening or reconsideration within 30 days (being subjected to expedited removal, detained, and forced to leave the United States, Fifth Amended Complaint, ¶ 42) would not have prevented the Association from filing a motion for reopening or reconsideration.

the context of Wong's other statements on the subject, the deposition does not reflect any lack of

intent to live in the United States.  App 303-04 ("Tao followers . . . do not have personal agenda

. . . [so she] had to go back to where [Qian Ren, predecessor leader of the Association] wanted

[her] to be" (App 303) and "I still need to serve my Tao duty. . . . Therefore, I put my mother

aside; I put my family aside to follow Qian Ren," (App 304)).  To the contrary, it indicates that

Wong continues to want to follow the mandate of Qian Ren, namely by "spread[ing] the Tao to

the whole world."  App 304.

### 2.  Abandonment of the Adjustment of Status Application

The United States also argues that the declaratory relief claim is moot because Wong's

adjustment application was deemed abandoned when she departed while under removal

proceedings.  During the relevant time period, federal regulations governing adjustment of status

applications provided as follows:

> The departure from the United States of an applicant who is under
> exclusion, deportation, or removal proceedings shall be deemed an
> abandonment of the application constituting grounds for
> termination of the proceeding by reason of the departure.  The
> departure of an applicant who is not under exclusion, deportation,
> or removal proceedings shall be deemed an abandonment of his or
> her application constituting grounds for termination, unless the
> applicant was previously granted advance parole by the Service for
> such absence, and was inspected upon returning to the United
> States.

8 CFR § 245.2(a)(4)(ii) (1999).

Wong argues that this regulation is inapplicable because her third application for

adjustment of status had already been denied (App 68-70) as of the date of her departure.

Because her application was no longer pending, she reasons that it could not be deemed

abandoned.  The question is whether a ruling on the merits precludes application of the

regulation's presumptive ruling that the applicant has chosen to abandon his or her application. Despite its logical appeal, in this context the argument that a denied application has been ruled on and, therefore, cannot be "abandoned" must be rejected.

The text of the abandonment regulation makes no distinction as to the adjudicatory stage of the adjustment of status application, but simply refers to "the proceeding" involving the application. A ruling on the merits of a particular application does not necessarily terminate a proceeding. Where, as here, the applicant's request for adjustment of status has been denied, he or she might take further action to continue the proceedings, such as filing an appeal or requesting reconsideration. While such actions might constitute grounds for renewing the proceeding, this regulation recognizes that other actions by the applicant might constitute grounds for terminating the proceeding. The issue is whether the regulation only contemplates the abandonment of applications on which no ruling has yet been issued, or also includes applications that have been denied.

Ambiguities in deportation statutes should be construed in favor of the alien. *Wong*, 373 F3d at 962; *see also Montero-Martinez v. Ashcroft*, 277 F3d 1137, 1141 (9th Cir 2002). When Wong departed the United States on June 22, 1999, an Order of Removal had been signed. App 54. Because Wong was "under . . . removal proceedings" at the time of her departure, her application was deemed abandoned under the first sentence of this regulation. In 2000, the regulation was amended by adding the word "pending" in the second sentence regarding departures by applicants who are not under removal proceedings. 8 CFR § 245.2(a)(4)(ii)(2000); Fed Register Vol 64, No. 104 (June 1, 1999) (". . .shall be deemed an abandonment of the application constituting grounds for termination of any *pending* application for adjustment of

status . . ."). The legislative history gives no hint as to the reason for the addition of that adjective. The amendment of only the second sentence in 2000 evidences an intent to not similarly restrict the first sentence (applicable to Wong) to pending applications. Thus, to the extent legislative history sheds any light on this issue, it tends to favor the interpretation proffered by the INS.

Moreover, construing this regulation to include only to those applications on which no substantive ruling has yet issued is inconsistent with the overall structure of immigration law. Adjustment is a process designed for aliens who are physically present in the United States. *See* 8 USC § 1255(a) & (i). Aliens who are not physically present in the United States and who wish to immigrate must obtain a visa from a consulate abroad. For an alien who has been removed, adjustment is no longer the appropriate avenue to permanent residence for that alien. Instead, the alien is again eligible to seek an immigrant visa (which, if the alien is eligible for adjustment, should be available already, *see* 8 USC § 1255(a), (i)) and to present herself for inspection as an immigrant. *See* 8 USC § 1181(a).

Thus, when Wong was removed, her departure (though involuntary) resulted in her application for adjustment of status being deemed abandoned and constituted grounds for the termination of the adjustment of status proceeding. Because she was and is outside the United States, she was no longer eligible for adjustment of status. A motion for reconsideration or reopening filed prior to her departure might have renewed the proceeding on Wong's adjustment of status of application. However, once she departed, any motion for reconsideration or reopening could not result in effective relief given her ineligibility. As a result, her claim for

32 - FINDINGS AND RECOMMENDATIONS

declaratory relief is moot, and the United States should be granted summary judgment against the Third Claim.

### B.  Denial of Opportunity to File Motion

Because a motion to reopen proceedings would be moot, this court need not address the alternative argument made by the United States that it did not improperly deny Wong the opportunity to file such a motion.

### IV.  Claims Against the United States Under the FTCA (Fifth Claim)

In the Fifth Claim, Wong alleges that the United States is liable under the FTCA for the torts of:  (1) false imprisonment; (2) invasion of privacy; and (3) negligence.  In addition, the Association alleges that a FTCA claim against the United States for negligence.[16]

### A.  False Imprisonment Claim Barred by Prior Rulings

False imprisonment has been specified as part of plaintiffs' FTCA claim(s) since the filing of the Second Amended Complaint (docket #83) over four years ago.  However, three years after that tort specification emerged, the parties filed cross-motions for summary judgment on the false imprisonment claim.[17]  After carefully considering the merits of those motions, this court concluded that, although the FTCA claim(s) were timely filed, this court lacked subject matter jurisdiction over the false imprisonment portion of the FTCA claim under 8 USC § 1252(a)(2)(A)(i):  "The core of [the false imprisonment] claim and [Wong's] arguments is that

---

[16]  At oral argument on these motions, counsel for plaintiffs clarified that the only portion of the Fifth Claim pertaining to the Association is that portion sounding in negligence.  Specifically, the Association contends that it was a "quasi-applicant" regarding Wong's application for adjustment of status and that, to the extent Wong was not provided proper notice of her rights when that application was denied, the Association has a claim co-extensive with the claim brought by Wong.  Thus, this court considers only that portion of the negligence claim with respect to the Association and deems all remaining claims as brought by Wong only.

[17]  See Plaintiff Kwai Fun Wong's Motion for Partial Summary Judgment Against Defendant United States (docket #192) and United States' Cross Motion for Partial Summary Judgment on Plaintiff Kwai Fun Wong's False Imprisonment Claim (docket #206),

no expedited removal order should have been entered against Wong.  However, this court lacks

jurisdiction to entertain such an argument."  Findings and Recommendation dated February 14,

2006 (docket #325) ("February 14, 2006 F&R"), pp. 9-15, adopted by Order dated April 10,

2006 (docket #358).  This court allowed that Wong might be able to allege some tort claim other

than false imprisonment premised upon the manner (as opposed to the fact) of her detention (*id*

at 15-16).  However, the false imprisonment claim only contests the fact, not the manner, of her

imprisonment.  This court sees no basis for review of that prior decision at this juncture.

Accordingly, to the extent Wong seeks summary judgment on the false imprisonment

specification of the Fifth Claim under the FTCA, the United States' motion for summary

judgment should be granted and Wong's motion should be denied.

### B.  <u>Legal Standards Governing Remaining FTCA Claims</u>

This court next turns to the FTCA claims alleging invasion of privacy and negligence.

The FTCA provides a limited waiver of sovereign immunity for certain torts committed by

federal employees acting within the scope of their employment.  Specifically, the "United States

shall be liable . . . in the same manner and to the same extent as a private individual under like

circumstances" would be liable under the law of the state "where the act or omission occurred."

28 USC §§ 1346(b) & 2674.  The universe of cognizable claims under the FTCA is limited by a

variety of exceptions which "are to be strictly construed.  If the asserted liability falls within an

exception to the FTCA, then the claims must be dismissed for lack of subject matter

jurisdiction."  *Bibeau v. Pac. Northwest Research Found., Inc.*, 339 F3d 942, 945 (9th Cir 2003)

(citations omitted).  Here, the United States argues that plaintiffs' FTCA claims are barred by

operation of the independent contractor and misrepresentation exceptions.  28 USC §§ 2671 & 2680(h).

If a claim is not barred by an exception, then it cannot be premised on a violation of federal law; instead, "plaintiffs must show that the conduct of the government violates some state law."  *Delta Sav. Bank v. United States*, 265 F3d 1017, 1025 (9th Cir 2001), *cert denied* 534 US 1082 (2002).  Moreover, even where uniquely governmental functions are at issue, the FTCA waives sovereign immunity only where local law would make a private person liable in tort, not where local law would make state or municipal entities liable.  *United States v. Olson*, 546 US 43, ___, 126 SCt 510, 512-13 (2005) (abrogating line of Ninth Circuit decisions to the contrary).  Where such uniquely governmental functions are at issue, the court's role is to determine whether any private person analogy for the particular kind of governmental task at issue provides a basis for liability.  *Id*, 126 SCt at 513.

### C.  **Conditions of Confinement:  Independent Contractor Exception**

Two of the remaining tort claims alleged by Wong are premised, at least in part, upon the conditions of confinement she endured in the Multnomah County jails.  Both her invasion of privacy claim and a portion of her negligence claim are premised on her contention that the United States must answer for the strip searches she endured while in detention.  In addition, her negligence claim is premised upon her contention that the United States failed to ensure that she received the diet mandated by her religion while housed at MCDC.  The United States contends that these assertions are outside the scope of its liability under the FTCA because they are barred by the independent contractor exception.  This court disagrees to the extent that Wong's claims are premised upon negligence of the INS as separate from the negligence of Multnomah County.

Subject to enumerated exceptions, the United States may be held liable for the negligent or wrongful act or omission of any "employee of the Government while acting within the scope of his office or employment."  28 USC § 1346(b)(1).  However, an "employee of the Government . . . does not include any contractor with the United States."  28 USC § 2671.  Under this "independent contractor" exception to FTCA, the "critical test for distinguishing an agent from a contractor is the existence of federal authority to control and supervise the detailed physical performance and day to day operations of the contractor."  *Hines v. United States*, 60 F3d 1442, 1446 (9th Cir 1995) (citations and internal quotation marks omitted).

The United States argues that Multnomah County, which operated the jails where Wong was detained, was an independent contractor.  As a result, the United States contends that it is not liable for Wong's invasion of privacy claim and any part of her negligence claim premised upon the strip searches and failure to provide meals adequate to meet her religious needs.  However, the independent contractor exception does not cut this wide a swath.

In *Logue*, "the Supreme Court held that the government was not liable for the negligent acts of an independent contractor running a jail, but did not rule out liability based on the negligent acts of the Government's employees in placing the inmate in the care of the contractor."  *Sandoval v. United States*, 980 F2d 1057, 1059 (9th Cir 1993); s*ee also Berkman v. United States*, 957 F2d 108, 114-15 (4th Cir 1992).

With regard to the strip searches, Wong alleges that government employees were negligent in placing her in Multnomah County jails because the United States knew or should have known that she would be subjected to strip searches.  Her claims hinge largely on the United States' failure to protect her from the blanket requirement of strip searches of inmates

36 - FINDINGS AND RECOMMENDATIONS

prior to changes in housing assignments from reception or when transferred to another

Multnomah County facility.  As in *Logue*, Wong alleges negligence by the United States

separate and apart from the negligence of Multnomah County in operating its detention facilities.


Similarly, the record supports the conclusion that prior to placing Wong in the custody of

Multnomah County, INS officials were told that she needed a "vegetarian" diet for religious

reasons.  Although the evidence indicates that Li (who communicated that information) and

Godfrey (to whom Li communicated that information) may have had a differing understanding

of the specific type of "vegetarian" meals that Wong's religious vows required, it is clear that the

fact that the request was religiously based was communicated to employees of the United States.

There is also evidence that INS officials later were told that Wong was not receiving meals

which complied with the mandates of her religion.  Based on that evidence, Wong alleges that,

both before and after they placed her in Multnomah County's custody, employees of the United

States failed to convey to Multnomah County that her need for a "vegetarian" diet was

religiously based.  As a consequence, Multnomah County took no action to inquire into Wong's

religiously based dietary needs.

The only evidence in the record indicates that Multnomah County had a policy of

accommodating dietary requests that were religiously or medically based.  Wong alleges that,

due to the failure of the INS to convey the information it had received, *i.e.* that her request for

"vegetarian" food was religiously based, the exact parameters of Wong's religiously based

dietary restrictions were never considered by Multnomah County.  In short, the specifications of


37 - FINDINGS AND RECOMMENDATIONS

negligence are geared at negligent acts by the INS separately from negligent acts by Multnomah
County and, thus, fall outside the independent contractor exception.

### D.  **Invasion of Privacy**

The second tort identified by Wong in connection with her FTCA claim is invasion of
privacy.  As discussed above, the independent contractor exception to the FTCA does not bar
this claim.  Thus, the issue is whether Wong can show that a "private individual under like
circumstances" would be liable under Oregon law.  28 USC §§ 1346(b) & 2674.

In general, the tort of invasion of privacy "protects the right of a plaintiff 'to be let
alone.'"  *Mauri v. Smith*, 324 Or 476, 482, 929 P2d 307, 310 (1996), quoting *Humphers v. First
Interstate Bank*, 298 Or 706, 714, 696 P2d 527, 531 (1985).  Under this "umbrella" tort, four
separate theories support a claim:  "(1) intrusion upon seclusion; (2) appropriation of another's
name or likeness; (3) false light; and (4) publication of private facts."  *Id* (citations omitted).  To
establish a claim under a theory of intrusion upon seclusion, plaintiff must prove three elements:
"(1) an intentional intrusion, physical or otherwise, (2) upon the plaintiff's solitude or seclusion,
or private affairs or concerns, (3) which would be highly offensive to a reasonable person."  *Id*.

It is undisputed that Wong was strip searched twice.  The record reveals no facts
supporting the inference that the reasons supporting Wong's detention or her behavior while in
detention justified such a search.  Moreover, there is no dispute that such a search amounts to a
severe invasion of privacy without invitation, permission or welcome.  *Kennedy v. Los Angeles
Police Dept.*, 901 F2d 702, 711 (9th Cir 1989) ("the intrusiveness of a body cavity search cannot
be overstated."); *also see Helton v. United States*, 191 F Supp 2d 179, 182-83 (D DC 2002)

(plaintiffs stated a claim for intrusion upon seclusion based on their allegations of a strip and squat search ordered by the United States Marshals Service).

However, this claim suffers from a fatal flaw in that no official of the United States actually conducted the strip searches of Wong. At best, the United States selected Multnomah County jails as detention facilities without ensuring that Multnomah County did not perform blanket strip searches of INS detainees. That may give rise to a negligence claim, as discussed next, but not to an invasion of privacy claim against the United States which requires an intentional act. Thus, the United States is entitled to summary judgment against the invasion of privacy portion of the Fourth Claim.

### E.  Negligence

Finally, both plaintiffs allege a claim for negligence against the United States under the FTCA. For the reasons that follow, this court concludes that the Association's claim is barred and that only Wong's assertions that the United States was negligent in making arrangements for her detention survives summary judgment.

### 1.  Association's Claim Barred by Economic Loss Rule

As discussed above, the Association contends that it was the "quasi-applicant" regarding Wong's application for adjustment of status because it filed the petition for an immigration visa (Form I-360) upon which Wong's request for adjustment of status is based. It is questionable whether the Association has standing to bring this claim. Even assuming the Association has standing, its negligence claim is nevertheless barred by Oregon's economic loss rule.

The Second, Third, and Fourth Amended Complaints each alleged an FTCA claim by both Wong and the Association for false imprisonment, intentional interference with economic

relations, and negligence.  Second Amended Complaint (docket #83), ¶¶ 50-52; Third Amended

Complaint (docket #110), ¶¶ 46-48; Fourth Amended Complaint (docket #170), ¶¶ 46-48.  The

bodies of those pleadings each alleged that the Association suffered both economic and non-

economic damages.  Second Amended Complaint (docket #83), ¶¶ 29-31; Third Amended

Complaint (docket #110), ¶¶ 25-27; and Fourth Amended Complaint (docket #170), ¶¶ 25-27.

The prayers for damages were ambiguous as to whether Wong, the Association, or both, sought

non-economic damages on the FTCA claim.  Second Amended Complaint, ¶ 51; Third Amended

Complaint, ¶ 47; and Fourth Amended Complaint, ¶ 47.  However, in opposing defendants'

motion against the "religious schism" claims, plaintiffs maintained that the Association's

damages claims under the RFRA and the FTCA were strictly economic in nature:

> [U]nder the Federal Tort Claims Act ("FTCA"), Plaintiff Wong
> seeks non-economic damages against the United States arising out
> of its negligence and false imprisonment of her. . . . Also, under
> the FTCA, both plaintiffs allege an intentional interference with
> economic relations arising out of Plaintiff Wong's arrest,
> imprisonment, disassociation from the Association and its
> members, strip search, and denial of the food mandated by her diet.

Corrected Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment on

Plaintiff's RFRA and Religious Schism Claims (docket #257), p. 18.

> THE COURT:  All right.  Well, let me hear the plaintiffs' response
> to this religious schism issue.
>
> MR. STEENSON:  Briefly, your Honor.
>
>         *        *        *
>
> Here's – here's what we view the claim by the Association to be, under
> RFRA.  And that is simply for the loss of membership, and a loss of
> corresponding donations.  Obviously the Association is not entitled to
> noneconomic damages, and their claim is going to be restricted to an
> economic claim.  And I didn't mean to leave out the FTCA, but likewise
> the FTCA.

40 - FINDINGS AND RECOMMENDATIONS

> THE COURT:  Actually, I'm glad you clarified that, because that was one question I had.  It appeared to me the Association could only have economic damages.
>
> MR. STEENSON:  Exactly.

Second Supplemental App 475-76 (Transcript of Court Proceedings December 20, 2005) (docket #268); *See also*, Findings and Recommendation dated January 10, 2006 (docket #287), pp. 10-11 and n5, adopted by Order dated February 21, 2006 (docket #332); *see also* App 418-19.

In the Fifth Amended Complaint, plaintiffs realleged a claim under the FTCA.  In doing so, plaintiffs dropped the portion of FTCA claim based on intentional interference with economic relations, kept the portion of the claim based on the torts of false imprisonment and negligence, and added invasion of privacy.  Fifth Amended Complaint, ¶ 49.  As do the Second, Third, and Fourth Amended Complaints, the allegations of the Fifth Amended Complaint allege both economic and non-economic injury to the Association (*id* at ¶¶ 29-31) and the prayer for the Fifth Claim is ambiguous as to what damages each plaintiff seeks:  "Plaintiffs are entitled to separate awards of economic and non-economic damages against Defendant United States in an amount to be determined at trial."  *Id* at ¶ 50.

The Association alleges no personal injury or damage to personal property.  Based on the history of this claim, it is evident that the Association seeks only economic damages related to the Fifth Claim under the FTCA, regardless of the nature of the alleged underlying tort.  During oral argument on the pending motions, plaintiffs reiterated that they still intend to pursue a negligence claim on behalf of the Association under the FTCA.  However, such a claim must be based on a viable state law claim.  In Oregon, "[w]hen a claim based on negligence seeks recovery for economic damages only, the claim must be predicated on some duty of the

negligent actor to the injured party beyond the common-law duty to exercise reasonable care to prevent foreseeable harm." *Lewis-Williamson v. Grange Mut. Ins. Co.*, 179 Or App 491, 493, 39 P3d 947, 949 (2002), citing *Onita Pac. Corp. v. Trustees of Bronson*, 315 Or 149, 159, 842 P2d 890, 896 (1992).  Specifically, the plaintiff must allege and prove that the defendant had some relationship to the plaintiff which gave rise to a duty to protect the economic interests of the plaintiff:

> [T]o recover purely economic losses, a plaintiff must plead some source of duty outside of the common law of negligence.  Such a duty arises only in attorney-client, architect-client, agent-principal, and similar relationships where the professional owes a duty of care to further the economic interests of the "client." . . .  [A] particular source for the duty to protect from economic losses is required even if economic losses are a foreseeable consequence of a defendant's conduct.  Thus, a plaintiff must first show the *existence* of a special relationship in which the defendant had some obligation to pursue the plaintiff's economic interests.  Only then does [the] foreseeability analysis come in to play.

*Roberts v. Fearey*, 162 Or App 546, 549-50, 986 P2d 690, 692-93 (1999) (citations omitted; emphasis in original).

The Association fails to allege or to submit evidence of any special relationship with the United States which would prevent application of the economic loss rule.  To the contrary, the only special relationship invoked in this case is that of a prisoner and guard.  That relationship may well affect Wong's FTCA claims, but has no bearing on any FTCA claim by the Association.  Instead, the only relevant relationship between the United States and the Association was that of a government (through its agency) adjudicating a petition for an immigrant visa.  Such a relationship is not analogous to the types of relationships discussed in *Roberts* and imposes no duty to protect from economic harm.  Accordingly, this court concludes that the Association's negligence claim – to the extent any such claim is alleged in the Fifth

Amended Complaint – is barred.  This leaves for consideration only the negligence claim alleged by Wong.

### 2.  Wong's Specifications of Negligence

The Fifth Claim (Fifth Amended Complaint, ¶¶ 49-51) does not expressly identify the actions or failures which form the basis of Wong's negligence claim.  However, in response to the United States' motion for summary judgment, Wong asserts that the INS was negligent in:

> (1) sending the employment authorization letter (some time prior to June 10, 1999);
>
> (2) selecting MCDC for detention of those it arrested and detained;
>
> (3) failing to take reasonable steps to ensure that she received vegetarian meals as required by her religious vows in light of the INS's knowledge that she needed such meals;
>
> (4) denying her third adjustment of status application; and
>
> (5) misstating her rights to review when issuing her application for adjustment of status denial letter.[18]

As these specifications reveal, the negligence claim is based on three categories of conduct on the part of the INS, namely:  (1) sending Wong letters regarding immigration proceedings which contained misstatements; (2) making arrangements for Wong's detention (choosing MCDC as the detention facility and simultaneously failing to ensure adequate

---

[18]  In Plaintiff's Response to the United States' First Set of Interrogatories, Wong also alleged that the United States was negligent in failing to follow the legal opinion of the INS Office of General Counsel and in failing to properly investigate Wong's claims to religious worker status, as well as the circumstances surrounding her claim to that status.  App 404-05.  However, Wong does not raise those specifications of negligence in her briefing on the present motions, and does not counter the reasons given by the United States for granting summary judgment against those specifications of negligence.  Thus, this court assumes that Wong has abandoned resort to those specifications as a basis for her negligence claim.

43 - FINDINGS AND RECOMMENDATIONS

constitutional safeguards); and (3) adjudicating Wong's adjustment of status application.  For the reasons that follow, this court concludes that only the allegations of negligence with respect to making arrangements for Wong's detention survive summary judgment.

Government bodies in Oregon can be liable for negligence with respect to the manner in which their law enforcement personnel discharge their duties and responsibilities.  *McAlpine* v. *Multnomah County,* 166 Or App 472, 482-83, 999 P2d 522, 528 (2000), *rev den* 336 Or 60, 77 P3d 635 (2003).

///

///

### a.  Claims Regarding Letters Barred by Misrepresentation Exception

The FTCA excludes from its reach "[a]ny claim arising out of . . . misrepresentation . . . ."  28 USC § 2680(h).  This misrepresentation exception "shields government employees from tort liability for failure to communicate information, whether negligent, or intentional." *Lawrence v. United States*, 340 F3d 952, 958 (9th Cir 2003), citing *United States v. Neustadt*, 366 US 696, 705-06 (1961).  "[A] negligent failure to inform, without more, is misrepresentation within the meaning of 28 USC § 2680(h).  'The intent of the section is to except from the [FTCA] cases where mere "talk" or failure to "talk" on the part of a government employee is asserted as a proximate cause of the damage sought to be recovered from the United States.'" *City and County of San Francisco v. United States*, 615 F2d 498, 505 (9th Cir 1980), quoting *Nat'l Mfg. Co. v. United States*, 210 F2d 263, 276 (8th Cir), *cert denied*, 347 US 967 (1954).

Wong alleges that, in violation of INS policy and with the intent to remove her from the United States, the INS "issued a deceitful letter . . . inducing Wong to appear at the Portland INS

44 - FINDINGS AND RECOMMENDATIONS

Office . . . purportedly to receive her Employment Authorization Card."  Fifth Amended

Complaint, ¶ 17.  Wong also alleges that she was "not provided with correct or timely

information on her right to appeal her adjustment of status denial and request a hearing before an

administrative law judge," despite defendants' "mandatory obligation to correctly and timely

inform [her] of her rights."  *Id* at ¶ 23.  Wong's response to the United States' motion on this

subject clarifies that she claims the INS "was negligent in assessing and communicating Ms.

Wong's rights of review for the denial of her application for adjustment of status."  Plaintiffs'

Corrected Memorandum in Opposition to United States Motion for Summary Judgment (docket

#421), p. 15.  Each of these allegations challenges the communication of allegedly false or

misleading information by the INS to Wong, namely that she could pick up employment

authorization documents and that she had no right of review of the denial of her request for

adjustment of status.

Wong asserts that the misrepresentation exception does not bar these claims, citing the

"operational tasks" distinction:

> Courts have had difficulty determining whether a claim is one for
> misrepresentation.  The concept is slippery; "any misrepresentation
> involves some underlying negligence" and "any negligence action can be
> characterized as one for misrepresentation because anytime a person does
> something he explicitly or implicitly represents that he will do the thing
> non-negligently."  *Guild v. United States*, 685 F2d 324, 325 (9th Cir 1982).
> To determine whether the claim is one of misrepresentation or negligence
> the court examines the distinction between the performance of operational
> tasks and the communication of information.  The Government is liable
> for injuries resulting from negligence and performance of operational
> tasks even though misrepresentations are collaterally involved.

*Mundy v. United States*, 983 F2d 950, 952 (9th Cir 1993), quoting *United States v. Fowler*, 913

F2d 1382, 1387 (9th Cir 1990).

45 - FINDINGS AND RECOMMENDATIONS

Rather than asserting injury from the information communicated in its employment authorization letter, Wong bases her claim on the act of sending the letter itself.  However, unlike *Mundy*, which involved the "operational task" of an allegedly negligent denial of a security clearance and the subsequent communication of that denial to plaintiff's employer, Wong's claim turns on the information communicated or omitted.  The employment authorization letter communicated information which induced her to appear, and the letter denying her request for adjustment of status omitted to mention the regulation (8 CFR § 103.5(a)) allowing a motion for reopening or reconsideration.

The difficulty in this case is that Wong, as did the plaintiff in *Gen. Pub. Util. Corp. v. United States*, 551 F Supp 521 (ED Pa 1982), alleges claims that are best described as a "hybrid" case falling somewhere in between two distinct lines of Supreme Court cases, namely *United States v. Neustadt*, 366 US 696 (1961), and *Indian Towing v. United States*, 350 US 61 (1955):

> The initial issue [in applying the misrepresentation exception is] one of characterization.  Does the complaint at bar sound in "negligent misrepresentation" or "negligence"?  The inquiry is a difficult one and conflicts between decided cases are not subject to facile resolution.
>
> [*Neustadt* and *Indian Towing*] highlight the conflicting lines of authority.
>
> \*          \*          \*
>
> The case at bar actually represents a hybrid case falling somewhere between *Neustadt* and *Indian Towing*.  The *Indian Towing* line of cases usually involves the negligent "operational control" of the harm-causing instrumentality.  Damages generally are expressed in terms of personal injury or loss of property.  The cases which follow *Neustadt* concern governmental transmission of information which results in damages flowing from commercial decisions based thereon.  Under *Neustadt*, there is no "operational control" and frequently no liability.  In the case at bar, we have the element

of the transmittal of false information coupled with the *Indian Towing* element of property damage.

Relying on *Neustadt*, Wong argues that the misrepresentation exception bars only those claims for damages resulting from commercial decisions based upon false or inadequate information provided by the government.  However, the statutory language does not support this restriction.  Instead, "[a]*ny claim* arising out of . . . misrepresentation" is barred by this exception.  28 USC 2680(h) (emphasis added).  The cases patterned after *Neustadt* may have arisen in the commercial context, as a result of which "[c]ourts have interpreted this exception to bar claims arising from commercial decisions based on false or inadequate information provided by the government."  *Frigard v. United States*, 862 F2d 201, 202 (9th Cir 1988), *cert denied*, 490 US 1098 (1989) (citations omitted).  However, it is equally accurate that courts, including the Ninth Circuit, have applied the misrepresentation exception in cases involving personal injuries.

In *Lawrence v. United States*, 340 F3d 952 (9th Cir 2003), the juvenile female plaintiff was sexually abused by a felon in a witness security program.  The felon was employed at a group home where the plaintiff was a resident and was also placed into the felon's care as his foster child.  Among other claims, the plaintiff brought a claim under the FTCA, alleging that two federal officials had failed to provide complete and accurate information at the exemption hearing at which the felon was seeking to pursue employment at the group home.  The Ninth Circuit affirmed dismissal of the FTCA claim based on application of both the discretionary function and the misrepresentation exception.

Cases in other districts have reached the same conclusion that the misrepresentation exception applies to personal injury claims, as well as to claims for financial loss. "Despite the language of *Neustadt* that describes the traditional tort of misrepresentation involving 'economic

affairs,' the misrepresentation exception of the FTCA has been applied to claims involving personal injury." *Russ v. United States*, 129 F Supp2d 905, 909 (MD NC 2001) (citing cases).

This court discerns no meaningful distinction between the basis of the claim in *Lawrence* and the basis of Wong's claim. Both cases allege personal injury (sexual assault of Lawrence; invasive strip searches of Wong)[19] resulting from allegedly false (employment documents) or incomplete (failure to cite regulation granting right to request reopening or reconsideration) information provided by the United States. Based on the broadly-worded text of the misrepresentation exception, as well as on *Lawrence* and cases from other courts applying the exception in the personal injury context, this court concludes that the misrepresentation exception bars Wong's claims for the United States' actions of sending both the employment authorization letter (Fifth Amended Complaint, ¶ 17), as well as the letter denying her request for adjustment of status (*id* at ¶¶ 18, 23-24).

## b.  Arranging for Wong's Detention

Two specifications of negligence identified by Wong relate to the United States' action of making arrangements for her detention. First, Wong alleges that by selecting Multnomah County jails as a detention facility, the INS subjected her to undue intrusion and harm and a violation of her Fourth Amendment rights while in its custody and control. Second, Wong alleges that after receiving complaints that she was not provided vegetarian meals, the United States did nothing to ensure that her First Amendment rights were not violated. As discussed

---

[19]  The "injury" attributable to the failure to inform Wong of her right to request reopening or reconsideration is somewhat more difficult to categorize. Wong contends that the failure to notify her of her right to request reopening or reconsideration denied her the right to such review. Whatever the nature the injury, however, it is barred by the misrepresentation exception because Wong alleges no facts which place her claim outside the scope of the misrepresentation exception.

above, the independent contractor exception does not bar these specifications to the extent they allege negligence separate and apart from the negligence of Multnomah County.

### i.  <u>Selecting MCDC as the Detention Facility</u>

Multnomah County had a written policy of strip searching all persons arriving at its detention facilities which violated the INS' own policy barring strip searches.  At least one INS official (Edenfield) knew of that policy.  Thus, it was foreseeable that Wong would be detained at a Multnomah County jail where a degrading and unlawful strip search was inevitable.  Although the INS did not control the day-to-day operations of the Multnomah County jails, it placed her in the care of Multnomah County with knowledge that it did not comply with federal law regarding strip searches of INS detainees.  By not ensuring that INS detainees were properly treated, the United States could be held negligent for allowing Wong to be subject to an invasion of privacy by Multnomah County.  *See Sandoval*, 980 F2d at 1059.

### ii.  <u>Vegetarian Meals</u>

Similarly, it was foreseeable that the failure to communicate the fact that Wong's request for a "vegetarian" diet was religiously-based would result in Multnomah County failing to provide her with a diet that met the strictures of her religious beliefs.  As discussed above, Beebe cannot be held liable for any constitutional violation because Multnomah County had a policy that would have met Wong's religiously-based dietary needs after detention and because he was unaware of any facts that Wong was not receiving the diet she requested.  However, this claim is premised not only on Beebe's conduct, but also on the conduct of other INS employees, namely Godfrey and Horne.  They were aware that Wong's dietary needs were religious, but failed to

49 - FINDINGS AND RECOMMENDATIONS

communicate the religious nature of her dietary requests to Multnomah County.  That failure is a

sufficient basis to support a negligence claim.

### c.  Adjudicating Wong's Adjustment of Status Application

Wong's final specification of negligence alleges that the INS negligently adjudicated her

application for adjustment of status.  Specifically, Wong contends that the INS was negligent in

failing to contact her or her attorneys, failing to interview her concerning the factual predicate of

her application, making assumptions about her motives in coming to and departing the United

States and her place of residence, improperly considering an inadmissibility determination that

was based on the false premise that she did not have a valid visa, and refusing to accept her

attorney's conclusions about Wong's eligibility to adjust her status.

The problem with this claim is the lack of any analogous liability on the part of private

persons under Oregon law.  As recognized in *C.P. Chem. Co., Inc. v. United States*, 810 F2d 34,

37 (2nd Cir 1987), "[a]s to certain governmental functions, the United States cannot be held

liable, for no private analog exists."  Thus, "quasi-legislative or quasi-adjudicative action by an

agency of the federal government is action of the type that private persons could not engage in

and hence could not be liable for under local law."  *Id*, quoting *Jayvee Brand v. United States*,

721 F2d 385, 390 (DC Cir 1983).  A private person could not be liable for negligently denying

an application for adjustment of status.  This forecloses any FTCA claim premised upon

negligence in adjudicating Wong's adjustment of status application.

Moreover, assuming Wong could overcome this hurdle, she has not identified any state-

law duty, the breach of which would give rise to a claim in this context.  She has failed to

establish the existence, source, or nature of any applicable standard of care governing such a

claim, relying instead on allegations that the INS acted "below the standard of care" in adjudicating her application for adjustment of status.  In the absence of a duty of care in Oregon applicable to private parties, this claim falls.

Finally – and perhaps most fatally – the INA precludes review of both the inadmissibility determination and the removal order.  8 USC §§ 1252(a)(2)(A) and 1225(b)(1)(A)(i).  Thus, even were Wong able to identify a private party analog and articulate an applicable standard of care, defendants would nonetheless be entitled to summary judgment against any claim premised on negligence in adjudicating Wong's adjustment of status application.

## <u>RECOMMENDATIONS</u>

For the reasons set forth above, plaintiff Wong's Motion for Partial Summary Judgment Against the Defendants David V. Beebe and the United States of America (docket #400) should be DENIED; defendant David Beebe's Motion for Summary Judgment (docket #403) should be GRANTED IN PART and DENIED IN PART; and defendant United States' Motion for Summary Judgment (docket #405) should be GRANTED IN PART AND DENIED IN PART as follows:

**<u>First Claim (Fourth Amendment)</u>:**
Deny summary judgment both to Wong and Beebe as to whether the strip searches violated the Fourth Amendment

**<u>Second Claim (First Amendment)</u>:**
Grant summary judgment to Beebe

**<u>Third Claim (Declaratory Judgment)</u>:**
Grant summary judgment to the United States

**<u>Fourth Claim (RFRA)</u>:**
Grant summary judgment to Beebe and deny summary judgment to Wong

**<u>Fifth Claim:  (FTCA)</u>**

51 - FINDINGS AND RECOMMENDATIONS

False Imprisonment: Grant summary judgment to the United States and deny summary judgment to Wong

Invasion of Privacy:  Grant summary judgment to the United States and deny summary judgment to Wong

Negligence:

Grant summary judgment to the United States against the Association as to all specifications;

Grant summary judgment to the United States against Wong and deny summary judgment to Wong as to sending letters containing misstatements and adjudicating adjustment of status application;

Deny summary judgment to the United States against Wong and deny summary judgment to Wong as to conditions of confinement.

As a result, the only remaining claims for trial are Wong's First Claim (Fourth Amendment) against Beebe concerning the strip searches and the portion of Wong's Fifth Claim (FTCA) alleging negligence by the United States based on the conditions of confinement.

## SCHEDULING ORDER

Objections to this Findings and Recommendation, if any, are due February 12, 2007.  If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then the response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 24th day of January, 2007.

/s/  Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge